IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION

DONALD CLAGGETT, *et al.*,     :

    Plaintiffs,

                          Case No. 3:18-cv-66

    v.     :

                          JUDGE WALTER H. RICE

ANTHONY WENZLER, *et al.*,

    Defendants.     :

---

DECISION AND ENTRY SUSTAINING MOTION FOR SUMMARY
JUDGMENT OF DEFENDANTS ANTHONY WENZLER AND THE CITY
OF MORAINE (DOC. #43); DISMISSING FEDERAL CLAIMS WITH
PREJUDICE AND STATE CLAIMS AND COUNTERCLAIMS WITHOUT
PREJUDICE; OVERRULING AS MOOT PLAINTIFFS' MOTION FOR
PARTIAL SUMMARY JUDGMENT ON DEFENDANT TOMI
HATFIELD'S COUNTERCLAIMS (DOC. #30), DEFENDANT
HATFIELD'S CROSS MOTION FOR SUMMARY JUDGMENT (DOC.
#33) AND HATFIELD'S MOTION FOR DECLARATORY JUDGMENT
(DOC. #60); JUDGMENT TO ENTER IN FAVOR OF DEFENDANTS
AND AGAINST PLAINTIFFS; TERMINATION ENTRY

---

Plaintiffs, Donald and Mindy Claggett, filed suit against Anthony Wenzler,

the City of Moraine, Ohio, and their neighbor, Tomi Hatfield, seeking damages

under 42 U.S.C. § 1983 for alleged constitutional violations, and requesting

declaratory judgment and injunctive relief. They also assert state law claims of

invasion of privacy, nuisance and conspiracy. Doc. #1. Defendant Tomi Hatfield

filed Counterclaims of intentional infliction of emotional distress, declaratory

judgment, invasion of privacy and trespass.

This matter is currently before the Court on Plaintiffs' Motion for Partial Summary Judgment on Defendant Tomi Hatfield's Counterclaims, Doc. #30, Defendant Hatfield's Cross Motion for Summary Judgment, Doc. #33, and on the Motion for Summary Judgment of Defendants Anthony Wenzler and the City of Moraine, Doc. #43. Hatfield also recently filed a Motion for Declaratory Judgment, Doc. #60.

## I.  Background and Procedural History

In May of 2016, Plaintiffs, Donald and Mindy Claggett, moved into a house on Shorelands Road in Moraine, Ohio. Their back yard abuts the back yard of Defendant Tomi Hatfield, who lives on Cottage Road. Directly to the east, adjacent to both of the properties, lies a vacant strip of land (the "Adjacent Strip"), which includes the land labeled on the map below as "Lease Area" and the lighter-colored right-of-way between the "Lease Area" and the properties owned by the Claggetts and Ms. Hatfield.



The Adjacent Strip is owned by the City of Moraine. Nevertheless, when Hatfield's parents bought the Cottage Road property in 1970, they believed that the Adjacent Strip belonged to them. They cut the grass, trimmed the bushes and trees, and graded the land. At one point in the 1970s, the City sent Hatfield's parents a letter instructing them to stop taking care of the Adjacent Strip because it belonged to the City. They complied with the City's demand. However, just a few months later, the City sent them another letter threatening them with fines if they did not clean up that property. Thereafter, the Hatfields continuously maintained the Adjacent Strip as if it were their own property, and placed a fire pit, picnic table and playset there. Doc. #47, PageID##308, 341.

In 2006, the fire department told Tomi Hatfield that she could not have a fire pit on the Adjacent Strip because that land belonged to the City. She protested, citing her family's long history of caring for that property. It was her understanding that the City then agreed to transfer ownership of the Adjacent Strip to her. Unbeknownst to her, this never happened. Doc. #47, PageID#308. Nevertheless, the City acted as if it were her property. In 2008, when a tree on the Adjacent Strip fell over during a windstorm and damaged another neighbor's property, the City demanded that she pay the cleanup costs. *Id.*; Doc. #48, PageID#411. Accordingly, when the Claggetts moved to the neighborhood in May of 2016, Hatfield was still taking care of the Adjacent Strip, believing that it now belonged to her.

Disputes over property boundary lines began before the Claggetts ever moved in.  A survey conducted in connection with the sale of the property showed that the existing fence, installed by the sellers, encroached on the Adjacent Strip on the east side of the house.  The survey also showed that the south side of the Claggetts' lot extended approximately eight feet beyond the existing fence, toward Hatfield's property.  Doc. #52-3, PageID##513-23.  Hatfield disagreed with this assessment.  Doc. #47, PageID#303.  Shortly after the Claggetts moved in, Hatfield contacted Anthony Wenzler, the City's Building and Zoning Administrator, about the property boundary between the lots.  He suggested that she have her own survey done.  Doc. #52-4, PageID##521-22.

With respect to the Adjacent Strip, it appears that, at that point, there was still some confusion about whether it was owned by the City or by Hatfield.  On May 31, 2016, Wenzler wrote to Donald Claggett that "[u]ntil I can prove otherwise, the [Adjacent Strip] belongs to . . . Tomi Hatfield."  He instructed Claggett not to trespass on that property.  He stated that "[i]f it is decided the city owns the lot it will ask Tomi Hatfield to remove her items[;] until then as for the past 40+ years she may use the lot as she and her family has."  Doc. #52-6, PageID#526.

On June 29, 2016, Hatfield reported to the Moraine Police Department that Donald Claggett was repeatedly trespassing on her property.  She complained that Claggett had removed the "No Trespassing" signs that Wenzler suggested that she put up, and was cutting grass on her property.  Doc. #52-7, PageID##527-28.  In

4

July of 2016, the Claggetts put up a new fence to better demarcate the actual property boundaries, as shown by the survey. On the east side of the lot, they moved the fence in so that it no longer encroached on the Adjacent Strip. On the south side of the lot, they extended the fence back several feet toward Hatfield's lot. They left two feet of grass behind the south side of the fence so that they could maintain the fence. Doc. #47, PageID#304.

Confrontations between Hatfield and the Claggetts continued. They often called the police to complain about each other. Likewise, on several occasions, the neighbors called the police about the ongoing verbal confrontations. Claggett complained to Wenzler that Hatfield was leaning stuff against the back of his fence. Claggett posted "no trespassing" signs, warning her to stay two feet off of the fence. Doc. #48, PageID#420. Hatfield and her sister, Ramona Dennison, who lives next door to the Claggetts, complained that Claggett installed video cameras that were pointed at their houses. *Id.* at PageID#405. At one point, Donald Claggett filed for a temporary protection order against Hatfield and Dennison. He later dismissed the case. Doc. #47, PageID#311-12.

Once, when Donald Claggett was walking on the Adjacent Strip, Hatfield confronted him about being on her property. He told her to go ahead and call the police. He claimed that the police could do nothing, given that the Adjacent Strip was owned by the City. *Id.* at PageID#304. Because this was contrary to what Hatfield believed, she confronted Wenzler. She showed him all of the documents supporting her belief that she owned the Adjacent Strip. She alleges that the City

also believed that she was the owner of that property. Wenzler promised to research the issue. Doc. #47, PageID##336-38.

In April of 2017, Wenzler determined that the City, in fact, still owned the Adjacent Strip. In response to Claggetts' complaints, he gave Hatfield seven days to remove her personal property from the lot. Doc. #52-8, PageID#529. It does not appear that she complied with this order.

On September 4, 2017, Hatfield again called the police because Donald Claggett was walking on the Adjacent Strip. When the police arrived, Hatfield told the officer that when she met with Wenzler earlier that day, he had told her that the property belonged to her; she was simply waiting on the deed. Claggett told the officer, however, that Wenzler indicated that the property belonged to him. Doc. #52-10, PageID##532-33. That evening, Donald Claggett emailed Wenzler, complaining that Hatfield was preventing his son from walking across the Adjacent Strip. He also complained that Hatfield had not yet removed her belongings from the Adjacent Strip. Doc. #52-9, PageID#530. It appears that Hatfield called the police again the following day. Doc. #52-10, PageID#532.

Donald Claggett confronted Wenzler in person and sent a follow-up email, threatening to sue. On September 6, 2017, Wenzler emailed Claggett that "the next time you come in my office you will act as an adult and not raise your voice telling me how to do my job[;] if you do that again you will be asked to leave." Wenzler told Claggett that the city was working on a resolution that would take about two weeks. Doc. #52-13, PageID##536-37.

6

Wenzler testified that the City Manager had suggested that, to resolve the dispute, the City could lease the Adjacent Strip to Hatfield. Wenzler did not share this information with the Claggetts or with Hatfield. Doc. #48, PageID#410. He further testified that he had no input in the City's decision to lease the property to Hatfield. *Id.*

On September 14, 2017, the City of Moraine agreed to lease the Adjacent Strip to Tomi Hatfield for fifteen years for ten dollars per year "in consideration for her prior efforts and expenditures associated with maintenance of said property and to ensure ongoing maintenance and care of the property." Doc. #1-2. The lease was signed by Moraine City Manager, David Hicks. According to Hicks, the lease merely reduced to writing the long-standing belief of both the City and Hatfield that she was maintaining and using the Adjacent Strip. Doc. #49, PageID#445. The ordinance was passed in executive session, without any advance notice to the Claggetts or to the public. The Claggetts learned of the lease two days later. Doc. #52-1, PageID#508. Although the property description attached to the lease defines the northern, southern and eastern boundaries of the Adjacent Strip, it fails to define the western boundary, the one that runs along the Claggetts' and Hatfield's property. Doc. #1-2, PageID#27.

Tensions between Hatfield and the Claggetts intensified after the lease was signed. Doc. #47, PageID#340. They continued to call the police about alleged trespassing on each other's property. The police, who did not know where the property lines were, said that this was a zoning issue. Doc. #48, PageID#413.

Claggett installed an additional two-foot section of fence to block Hatfield and her sister, Ramona Dennison, from cutting across his property to each other's yards. *Id.* at PageID#417; Doc. #52-1, PageID#509.

In September of 2017, twelve days after the lease was executed, Donald and Mindy Claggett filed suit against Tomi Hatfield and Ramona Dennison in the Municipal Court of Kettering. The Claggetts sought approximately $6000 in damages to cover the cost of surveillance cameras, the fence and attorney's fees. In a Counterclaim, Hatfield and Dennison sought a similar amount in attorney's fees and damages for harassment. Doc. #30-1.[1]

On October 9, 2017, Wenzler tied yellow caution tape to stakes along the Claggetts' driveway to delineate the property boundary between the Claggetts' property and the Adjacent Strip. Doc. #48, PageID#413. He explained that, because the fence was right on the property line, he gave the Claggetts an extra foot so that they could get around it. The Claggetts then had the lot surveyed again. *Id.*

When Wenzler returned on October 27, 2017, to make the necessary adjustments to the caution tape, Donald Claggett secretly recorded the conversation. Doc. #52-1, PageID#509. According to the Verified Complaint,

---

[1] A trial was held on October 31, 2017. At the trial, the magistrate judge questioned whether the municipal court had jurisdiction over a boundary line dispute. He took the matter under advisement, and later dismissed the case, finding that both parties' claims for damages were "unfounded" and "unsupported by any credible evidence." Doc. #30-1, PageID##116-17.

Wenzler told Claggett that he was leaving the tape up "because I want everybody to know what the property lines [are]. Just like you have your no trespassing signs on the back of your fence. Stay two feet off the fence . . . If you're going to be that damn petty, I am being that damn petty." He told Donald Claggett that he was tired of him, and instructed him not to cross over the line to cut his grass. He said "[i]f you want to cut your grass, you go through that little stupid fence you put up to block people through there and you walk your mower down your side and cut that little strip." Doc. #1, PageID##5-6.

Although Claggett removed the tape for a short period of time, Wenzler put it up again in December of 2017, after Claggett called the police to report an unknown prowler wandering around his front yard. Doc. #52-1, PageID#509. The police department notified Wenzler that Claggett had complained about people walking across his yard and had threatened to shoot anyone on his property. Doc. #48, PageID#413. Claggett maintains that the presence of the tape "has prompted embarrassing questions to my wife and me from curious neighbors and is a source of daily annoyance and humiliation to me and my family." *Id.*

In January of 2018, Donald Claggett again secretly recorded a meeting with Wenzler and Moraine's Chief of Police. Wenzler said that, given that the Claggetts claimed that their security cameras had recently captured nineteen people cutting across their front yard, there must still be confusion about where the boundary lines are. Therefore, the tape would remain. Doc. #1, PageID##8-9.

On March 9, 2018, the Claggetts filed suit against Anthony Wenzler, the City of Moraine, and Tomi Hatfield.[2] Seeking relief under 42 U.S.C. § 1983, the Claggetts alleged violations of several constitutional rights. In addition to monetary damages, they also seek a declaratory judgment to the effect that the City's purported lease of the Adjacent Strip to Tomi Hatfield is null and void. In addition, they seek injunctions: (1) prohibiting Defendants from barring the Claggetts from the Adjacent Strip; (2) prohibiting Defendants from amending or revising the purported lease or entering into a new lease to cure any defects; (3) prohibiting Defendants from maintaining the caution tape; and (4) prohibiting the City from using its enforcement discretion to bully and harass the Claggetts or to aid further such conduct by Ms. Hatfield.

Hatfield filed several state law Counterclaims against the Claggetts: (1) intentional infliction of emotional distress; (2) declaratory judgment concerning the property rights in question; (3) invasion of privacy; and (4) trespass. Doc. #15.

In May of 2018, after this lawsuit was filed, the parties reached an agreement whereby the Claggetts would notify Hatfield when they needed to access the Adjacent Strip either to mow their grass or maintain their fence, and Hatfield would temporarily remove the caution tape to allow them to do so. Doc. #22. At his deposition, Donald Claggett indicated on a map where his fence is and

---

[2] The Claggetts assert no claims directly against Ms. Hatfield. She is named as a defendant only because the requested injunctive and declaratory relief affects her property interests.

why he is unable to access this narrow sliver of his property without stepping onto the Adjacent Strip. Doc. #45, PageID##278-81. That map is attached to this Decision and Entry as Exhibit A.

Plaintiffs have filed a Motion for Partial Summary Judgment on the Counterclaims of intentional infliction of emotional distress, invasion of privacy and trespass. Doc. #30. Defendant Hatfield then filed a Cross Motion for Summary Judgment on Plaintiffs' request for a declaratory judgment concerning the validity of the lease. Doc. #33. Defendants Wenzler and the City of Moraine have filed a Motion for Summary Judgment on all claims asserted against them. Doc. #43. Those motions are now fully briefed and ripe for decision.

## II.    Summary Judgment Standard

Summary judgment must be entered "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). The moving party always bears the initial responsibility of informing the court of the basis for its motion, and identifying those portions of the record which it believes demonstrate the absence of a genuine issue of material fact. *Id.* at 323; *see also Boretti v. Wiscomb*, 930 F.2d 1150, 1156 (6th Cir. 1991).

"Once the moving party has met its initial burden, the nonmoving party must present evidence that creates a genuine issue of material fact making it necessary

to resolve the difference at trial." *Talley v. Bravo Pitino Rest., Ltd.*, 61 F.3d 1241, 1245 (6th Cir. 1995); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986). Once the burden of production has so shifted, the party opposing summary judgment cannot rest on its pleadings or merely reassert its previous allegations. It is not sufficient to "simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). Rule 56 "requires the nonmoving party to go beyond the [unverified] pleadings" and present some type of evidentiary material in support of its position. *Celotex*, 477 U.S. at 324. "The plaintiff must present more than a scintilla of evidence in support of his position; the evidence must be such that a jury could reasonably find for the plaintiff." *Michigan Prot. & Advocacy Serv., Inc. v. Babin*, 18 F.3d 337, 341 (6th Cir. 1994).

Summary judgment shall be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "Summary judgment will not lie if the dispute about a material fact is 'genuine,' that is, if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248. In determining whether a genuine dispute of material fact exists, a court must assume as true the evidence of the nonmoving party and draw all reasonable inferences in favor of that party. *Id.* at 255. If the parties present conflicting evidence, a court may not decide which evidence to believe. Credibility

determinations must be left to the fact-finder.  10A Wright, Miller & Kane, *Federal Practice and Procedure* Civil 3d § 2726 (1998).

In determining whether a genuine dispute of material fact exists, a court need only consider the materials cited by the parties.  Fed. R. Civ. P. 56(c)(3).  "A district court is not . . . obligated to wade through and search the entire record for some specific facts that might support the nonmoving party's claim." *InterRoyal Corp. v. Sponseller*, 889 F.2d 108, 111 (6th Cir. 1989), *cert. denied*, 494 U.S. 1091 (1990).  If it so chooses, however, the court may also consider other materials in the record.  Fed. R. Civ. P. 56(c)(3).


### III.    Motion for Summary Judgment of Defendants Anthony Wenzler and the City of Moraine (Doc. #43)

Defendants Anthony Wenzler and the City of Moraine have moved for summary judgment on all claims asserted against them.  The Court turns first to the federal claims asserted under 42 U.S.C. § 1983.

### A.    42 U.S.C. § 1983 Claims

Plaintiffs, Donald and Mindy Claggett, seek damages, injunctive and declaratory relief under 42 U.S.C. § 1983.  That statute provides, in relevant part, as follows:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the

13

Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress.

42 U.S.C. § 1983.

Section 1983 "'is not itself a source of substantive rights,' but merely provides 'a method for vindicating federal rights elsewhere conferred.'" *Graham v. Connor*, 490 U.S. 386, 393-94 (1989) (quoting *Baker v. McCollan*, 443 U.S. 137, 144 n. 3 (1979)). In order to recover under § 1983, a plaintiff must prove that a defendant, while acting under color of state law, violated rights secured by the Constitution or laws of the United States. *See Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 150 (1970).

There is no question that Anthony Wenzler was acting under color of state law in his interactions, as the City of Moraine's Building and Zoning Administrator, with the Claggetts and Ms. Hatfield over the property line disputes. There is also no dispute that the City was acting under color of state law when it passed the ordinance and leased the Adjacent Strip to Hatfield. The question is whether either Defendant's conduct violated rights secured by the Constitution or laws of the United States.

The Claggetts maintain that Defendants violated their constitutional rights by: (1) leasing the Adjacent Strip to Tomi Hatfield in retaliation for exercising their federally-protected rights; and (2) installing and refusing to remove the yellow caution tape along the boundary between the Adjacent Strip and Plaintiffs' property. The Complaint itself makes vague references to due process and equal

protection rights, along with retaliation. However, it fails to differentiate between § 1983 claims made against the City and those made against Wenzler.

Defendants argue that, based on the evidence presented, no reasonable jury could find that the alleged conduct rose to the level of a constitutional violation. They also argue that Wenzler is entitled to qualified immunity on the § 1983 claims asserted against him in his individual capacity. The Court turns first to the claims brought against the City of Moraine.

### 1. Municipal Liability

Citing *City of Los Angeles v. Heller*, 475 U.S. 796 (1986), Defendants argue that, absent a threshold finding that an individual city employee has violated the Claggetts' constitutional rights, there is no basis for imposing municipal liability. Defendants argue that none of Mr. Wenzler's conduct rises to the level of a constitutional violation, and note that the Claggetts did not sue David Hicks or the city council members. Defendants therefore argue that, under no circumstances may the City be held liable under § 1983.

This is simply incorrect. It is true that a governmental entity, like the City of Moraine, cannot be held liable under § 1983 merely because it employs an individual who engages in unconstitutional conduct. Rather, a plaintiff must prove that a policy or custom of the governmental entity was the "moving force" behind the alleged constitutional violation. *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 694 (1978). Such a policy or custom may consist of: "(1) the municipality's legislative enactments or official agency policies; (2) actions taken by officials with

15

final decision-making authority; (3) a policy of inadequate training or supervision; or (4) a custom of tolerance or acquiescence of federal rights violations." *Thomas v. City of Chattanooga*, 398 F.3d 426, 429 (6th Cir. 2005). "*Monell* reasoned that recovery from a municipality is limited to acts that are, properly speaking, acts 'of the municipality'— that is, acts which the municipality has officially sanctioned or ordered." *Pembaur v. City of Cincinnati*, 475 U.S. 469, 480 (1986).

In *Heller*, following a jury verdict in favor of the one remaining police officer on claims of arrest without probable cause and use of excessive force, the district court dismissed the § 1983 claims against the City of Los Angeles. The Supreme Court upheld this decision, noting that "[i]f a person has suffered no constitutional injury at the hands of the individual police officer, the fact that the departmental regulations might have *authorized* the use of constitutionally excessive force is quite beside the point." *Id.* at 799. As the Sixth Circuit has noted, "[t]he point in *Heller* was that the city could not be held responsible for a constitutional violation which could have occurred but did not." *Garner v. Memphis Police Dep't*, 8 F.3d 358, 365 (6th Cir. 1993).

Defendants' reliance on *Heller* is misplaced. In contrast to *Heller*, the Claggetts' § 1983 claim against the City is based *not on actions taken by Anthony Wenzler*, but rather on the City's decision to pass the ordinance and then lease the Adjacent Strip to Tomi Hatfield. Anthony Wenzler testified that he was not involved in this decision. Doc. #48, PageID##410. City Manager David Hicks recommended that the City pass the ordinance and it did so in an executive

16

session. He then signed the lease. Doc. #49, PageID#446-47. The ordinance and the resulting lease constitute an official "policy" of the City.

To the extent that the City passed the ordinance and executed the lease in violation of the Claggetts' constitutional rights, the City may be held liable for its own conduct under § 1983, regardless of whether Wenzler engaged in separate unconstitutional conduct related to his interactions with the Claggetts.

> [I]t is plain that municipal liability may be imposed for a single decision by municipal policymakers under appropriate circumstances. No one has ever doubted, for instance, that a municipality may be liable under § 1983 for a single decision by its properly constituted legislative body . . . because even a single decision by such a body unquestionably constitutes an act of official government policy.

*Pembaur*, 475 U.S. at 480.

Therefore, the question is whether the City's lease of the Adjacent Strip to Hatfield violated the Claggetts' constitutional rights. Although the Claggetts allege that Defendants' conduct implicated numerous constitutional provisions, the crux of their claim is that the City leased the Adjacent Strip to Hatfield in retaliation for the Claggetts' exercise of their First Amendment rights.

### a. First Amendment Retaliation

The First Amendment to the United States Constitution protects the right of the people to "petition the Government for a redress of grievances." U.S. Const. amend. I. "[R]etaliation by public officials against the exercise of First Amendment rights is itself a violation of the First Amendment." *Holzemer v. City of Memphis*, 621 F.3d 512, 523 (6th Cir. 2010) (internal quotation omitted). In *Thaddeus-X v.*

*Blatter*, 175 F.3d 378 (6th Cir. 1999), the court noted that "[i]t is well established that government actions, which standing alone do not violate the Constitution, may nonetheless be constitutional torts if motivated in substantial part by a desire to punish an individual for exercise of a constitutional right." *Id.* at 386.

> In order to prove a claim for retaliation, a plaintiff must establish the following elements: (1) that the plaintiff was engaged in a constitutionally protected activity; (2) that the defendant's adverse action caused the plaintiff to suffer an injury that would likely chill a person of ordinary firmness from continuing to engage in that activity; and (3) that the adverse action was motivated at least in part as a response to the exercise of the plaintiff's constitutional rights.

*Bloch v. Ribar*, 156 F.3d 673, 678 (6th Cir. 1998).

Defendants concede that the Claggetts frequently engaged in constitutionally-protected activity. Not only did the Claggetts repeatedly complain to Wenzler and the police about the property boundaries and about Hatfield's alleged claim of ownership in the Adjacent Strip, but they also regularly appeared at city council meetings to voice their opinions on a variety of matters. Doc. #49, PageID##438-42.

Defendants argue, however, that the Claggetts cannot satisfy the second element of a First Amendment retaliation claim. Defendants maintain that, based on the evidence presented, no reasonable jury could find that the City's lease of the Adjacent Strip to Hatfield caused the Claggetts to suffer an injury that would likely chill a person of ordinary firmness from continuing to engage in that protected conduct. The Court agrees.

The Claggetts never held a property interest in the Adjacent Strip. The City has held the deed to that piece of property since 1964, Doc. #43-2, PageID#220, and still does. Nevertheless, as the City points out, there is considerable evidence to support a finding that Hatfield was justified in her belief that she, in fact, owned the Adjacent Strip. But for one brief period in the 1970s, her family had maintained that property for more than forty years. She believed that the City had transferred the Adjacent Strip to her in 2006. Doc. #47, PageID#308. In 2008, when a tree on the Adjacent Strip fell and damaged another neighbor's property, the City even demanded that she pay the cleanup costs. *Id.*; Doc. #48, PageID#411.

After the Claggetts moved in, they challenged Hatfield's claim of ownership in the Adjacent Strip. Donald Claggett argued that, because the Adjacent Strip belonged to the City, Hatfield had no authority to exclude his family from using it. He also maintained that she should be required to remove all of her personal property from the Adjacent Strip. Wenzler's email messages to Claggett in May of 2016, indicate that there was still considerable confusion in his mind over the question of whether the City or Hatfield owned the Adjacent Strip. Docs. #52-5, 52-6.

Notably, it was Claggett himself who pushed the City to resolve the question of ownership once and for all. On September 4, 2017, Claggett emailed Wenzler that the cops had been called twice that day about "this unresolved issue" which "needs resolved ASAP." Doc. #52-9, PageID#530. The next day, Donald

Claggett accused Wenzler of telling him that the City owned the Adjacent Strip, but telling Hatfield that she owned the property. Claggett noted that the police had been called again that day. He told Wenzler that the issue "needs resolved NOW. Police have better things to do." Doc. #52-11, PageID#534.

On September 6, 2017, Wenzler informed Claggett that the City was "working on a resolution which will take around 2 weeks." Doc. #52-13, PageID#536. Unbeknownst to Claggett, that "resolution" was the City's lease of the Adjacent Strip to Hatfield, which was finalized on September 14, 2017. David Hicks testified that this lease simply memorialized the parties' understanding that, because Hatfield and her family had maintained the Adjacent Strip for so many years, they were permitted to use that property as they wished. Doc. #49, PageID#445. Understandably, the Claggetts were not happy with this "resolution," given that Hatfield now had authority to prevent them from setting foot on the Adjacent Strip. Nevertheless, the Claggetts' disagreement with the City's decision does not rise to the level of a constitutional injury.

The question is whether this alleged "injury" would likely chill a person of "ordinary firmness," *i.e.,* an average citizen, from continuing to engage in that protected First Amendment activity. *Bloch*, 156 F.3d at 681. Defendants note that the Claggetts have not been deterred, as evidenced by the fact that they "continue to complain to the City about anything and everything." Doc. #58, PageID#561. Nevertheless, *actual* deterrence on the part of the plaintiff is not necessary; the only question is "whether a person of ordinary firmness would be

deterred." *Fritz v. Charter Twp. of Comstock*, 592 F.3d 718, 728 (6th Cir. 2010). *But see Wurzelbacher v. Jones-Kelley*, 675 F.3d 580, 585 (6th Cir. 2012) (noting that the fact that plaintiff was not deterred in the exercise of his First Amendment rights as a result of defendants' conduct supported the conclusion that neither would "a person of ordinary firmness" be deterred).

Whether a person of ordinary firmness would be deterred by the alleged injury is typically a question of fact for the jury. However, when the adverse action is "inconsequential," resulting in only a *de minimis* injury, the claim may be dismissed as a matter of law. *Id.* at 583-85. *See also Maben v. Thelen*, 887 F.3d 252, 266 (6th Cir. 2018) ("some adverse actions are so *de minimis* that they do not rise to the level of a constitutionally cognizable injury."). The Sixth Circuit has noted that "the purpose of the standard is to avoid trivializing the First Amendment by eliminating suits based upon insignificant acts of retaliation." *Bell v. Johnson*, 308 F.3d 594, 606 (6th Cir. 2002).

As the Sixth Circuit has noted, there are few cases addressing First Amendment retaliation claims brought by plaintiffs who are not public employees or prisoners. *Fritz*, 592 F.3d at 724. An "adverse action" has been found if a private citizen's economic interests are threatened. For example, in *Fritz*, the court held that plaintiff sufficiently alleged an "adverse action" where defendant denied plaintiff's requests for zoning and signage variances in connection with her home business, and threatened her business relationship with her employer if it did not "reign in" her exercise of her First Amendment rights. *Id.* at 725-28. Likewise, in

*Holzemer*, the court found that the defendant's purposeful delay in granting permits necessary for the plaintiff to continue to operate his business constituted an "adverse action." 621 F.3d at 524-25.

An "adverse action" has also been found when a school official filed a report alleging child abuse, given that such a report would have "'powerfully dissuasive' consequences that would lead reasonable parents to refrain from engaging in protected activity." *Wenk v. O'Reilly*, 783 F.3d 585, 595 (6th Cir. 2015) (citing *A.C. ex rel. J.C. v. Shelby Cty. Bd. of Educ.*, 711 F.3d 687, 698 (6th Cir. 2013)). In *Bloch v. Ribar*, 156 F.3d 673 (6th Cir. 1998), the plaintiff alleged that, in response to their criticism of the sheriff, he released confidential and highly personal details of her rape, causing her great humiliation and emotional distress. The court found that defendant's conduct caused an "injury that would chill people of ordinary firmness from continuing to engage in constitutionally protected activity." *Id.* at 681.

The Sixth Circuit has held, however, that a mere threat by a public agency to file suit over a property dispute did not constitute an "adverse action" for purposes of First Amendment retaliation. *Hornbeak-Denton v. Myers*, 361 F. App'x 684, 689 (6th Cir. 2010). Likewise, a public agency's improper database searches to gather information about a citizen who publicly criticized President Obama's policies was found to be "inconsequential" where the information was never publicly disclosed and did not threaten the plaintiff's livelihood. *Wurzelbacher v. Jones-Kelley*, 675 F.3d 580, 584 (6th Cir. 2012).

District courts within the Sixth Circuit have refused to find an "adverse action" where a township board member pretended to videotape the plaintiff in a mocking manner and cut her off from speaking at a meeting. *Cook v. Greenleaf Twp.*, No. 16-cv-14060, 2018 WL 2219642, at *5 (E.D. Mich. May 15, 2018). Likewise, the loss of twenty seconds of speaking time at a city council meeting was deemed "a trivial deprivation." *Timmon v. Robinson*, No. 1:10-cv-823, 2011 WL 3897984, at *5 (W.D. Mich. Aug. 17, 2011). In *Moore v. Shelby County, Kentucky*, 369 F. Supp. 3d 802, 809 (E.D. Ky. 2019), the court found that plaintiff suffered no "adverse action" when she was required to make appointments to view videos, when certain videos she had requested were deleted, and when she was prohibited from volunteering at the animal shelter.

Under the unique circumstances presented here, the Court concludes that no reasonable jury could find that the City's conduct in leasing the Adjacent Strip to Hatfield, who had maintained the property as her own for decades, caused the Claggetts to suffer any injury that would likely chill a person of ordinary firmness from continuing to engage in protected First Amendment activity.

Given that the Claggetts never had a protected property interest in the Adjacent Strip, the lease resulted in no *direct* injury to them. In contrast to *Fritz* and *Holzemer*, the Claggetts have suffered no economic consequences as a result of the lease. Nor have they alleged that the lease of the Adjacent Strip to Ms. Hatfield caused them humiliation and emotional distress of the same degree at issue in *Wenk* or *Bloch.*

23

Given that Hatfield refuses to allow the Claggetts to enter onto the Adjacent Strip, it does make it somewhat more inconvenient for them to mow the narrow strip of grass between their fence and the Adjacent Strip, and to maintain the fence on that side of the property. Nevertheless, this inconvenience is *de minimis* in nature. No reasonable jury would find that this alleged "injury" would chill a person of ordinary firmness from continuing to engage in protected First Amendment activity. Because the Claggetts have failed to present sufficient evidence to create a genuine issue of material fact on this element of their First Amendment retaliation claim, the City is entitled to summary judgment on this claim.

Having determined that no reasonable jury could find that the City's conduct in leasing the Adjacent Strip to Hatfield caused the Claggetts to suffer any injury that would likely chill a person of ordinary firmness from continuing to engage in protected First Amendment activity, the Court need not reach the third element of the retaliation claim—that the adverse action was motivated, at least in part, as a response to the exercise of the plaintiffs' constitutional rights.

Nevertheless, with respect to this third element, the Court notes the following. The Claggetts challenged Tomi Hatfield's claim that she owned the Adjacent Strip and had the right to exclude them and others from the property. According to the Claggetts, her claim was contrary to the City's actual property records. The Claggetts therefore demanded that the City resolve the issue. It did so by leasing the Adjacent Strip to Hatfield, thereby memorializing the parties'

existing, unwritten understanding that, because Hatfield's family had maintained the Adjacent Strip for decades, she had the exclusive right to use that property as her own.

Although the City clearly took this action *in response* to the Claggetts' demand for action, there is little or no evidence to support a finding that it leased the Adjacent Strip to Hatfield in order to *punish* the Claggetts for exercising their First Amendment rights. Rather, it appears that the City resolved this issue on what it believed to be purely equitable grounds.

Hatfield testified that it was her understanding that the City had already deeded the Adjacent Strip to her in 2006. Doc. #47, PageID#308. David Hicks testified that Hatfield presented quite a lot of documentation, including a letter from a former mayor of the City of Moraine, in support of her claim that she and her family had maintained the property for decades. Doc. #49, PageID#447. In addition, Wenzler testified that he verified that the City's street department had not been maintaining the Adjacent Strip. Moreover, the City had sent a letter to Hatfield indicating that, as the owner of that property, she was responsible for removing a tree that had fallen during a windstorm. Doc. #48, PageID#411. Under these circumstances, it was only fair and reasonable that the City memorialize its unwritten understanding that Hatfield had the right to treat the Adjacent Strip as her own.

Based on the foregoing, the Court concludes that Defendants are entitled to summary judgment on the Claggetts' First Amendment retaliation claim against the City with respect to the ordinance and the lease.

### b. Other Constitutional Provisions

To the extent that the Claggetts also allege that the ordinance and the lease violated the Takings Clause, the Procedural and Substantive Due Process Clauses, and the Equal Protection Clause of the Constitution, these arguments can be disposed of rather quickly.

The Takings Clause of the Fifth Amendment, applicable to the states through the Fourteenth Amendment, prohibits the Government from taking private property for public use without just compensation. U.S. Const. amend. V. The Due Process Clause of the Fourteenth Amendment prohibits the Government from depriving any person of life, liberty or property without due process of law. U.S. Const. amend. XIV § 1.

Given that the Claggetts have no protected property interest in the Adjacent Strip, they have no viable Takings Clause claim against the City. *See Puckett v. Lexington-Fayette Urban Cty. Gov't*, 833 F.3d 590, 609 (6th Cir. 2016) ("success on Plaintiffs' Takings Clause claim necessarily implies that they actually had a protected property interest."). Likewise, the absence of a protected property interest bars their Procedural and Substantive Due Process claims. *Id.* at 604-05 (holding that only after identifying a protected liberty or property interest need the court consider whether the plaintiff was deprived of that interest without the

requisite due process of law).  Even assuming *arguendo* that the Claggetts had a protected property interest in the Adjacent Strip, no reasonable jury could find that the City lacked a "rational basis" for leasing the Adjacent Strip to Hatfield, given her long history of caring for the property.  *See id.* at 608.  As Hicks explained, the lease simply memorialized the understanding that already existed between the City and Hatfield.

The Equal Protection Clause of the Fourteenth Amendment prohibits States from denying any person equal protection of the laws.  U.S. Const. amend. XIV, § 1.  "The states cannot make distinctions which either burden a fundamental right, target a suspect class, or intentionally treat one differently from others similarly situated without any rational basis for the difference*." Radvansky v. City of Olmsted Falls*, 395 F.3d 291, 312 (6th Cir. 2005) (citing *Village of Willowbrook v. Olech*, 528 U.S. 562, 564 (2000)).

Here, no fundamental right is at issue and the Claggetts do not contend that they belong to a suspect class.  Rather, they argue that the City treated them differently than Ms. Hatfield without any rational basis for doing so.  Donald Claggett testified that, like Ms. Hatfield, he mowed the Adjacent Strip "numerous times."  Doc. #52-1, PageID#508.  Even assuming that this is true, it cannot be argued that he and Hatfield are "similarly situated."  Hatfield and her family have maintained and used the Adjacent Strip since 1970; the Claggetts did not move to the neighborhood until 2016.  No reasonable jury could find that the City lacked a rational basis for leasing the Adjacent Strip to Hatfield instead of to the Claggetts.

### c. Summary

Given the Court's conclusion that no reasonable jury could find that the City's conduct, in passing the ordinance and leasing the Adjacent Strip to Ms. Hatfield, violated any of the Claggetts' constitutional rights, the City is entitled to summary judgment on the § 1983 claims asserted against it. Accordingly, the Claggetts are not entitled to any of the injunctive or declaratory relief they have requested against the City under § 1983. The Court makes no determination concerning the validity of the lease.

### 2. Claims Against Anthony Wenzler

The Claggetts have sued Anthony Wenzler in his individual capacity. As the Supreme Court explained in *Kentucky v. Graham*, 473 U.S. 159 (1985), an individual-capacity suit seeks to impose personal liability on a government official for actions taken under color of state law. *Id.* at 165. With respect to the § 1983 claims brought against him, Wenzler seeks summary judgment on qualified immunity grounds.

The Claggetts argue that, because Wenzler did not raise the qualified immunity defense in his Answer, he has waived it. *See Kennedy v. City of Cleveland*, 797 F.2d 297, 300 (6th Cir. 1986) (noting that failure to plead qualified immunity as an affirmative defense may operate as a waiver). They acknowledge, however, that no waiver occurs when the defense is raised early enough that the plaintiff's ability to respond to it is not prejudiced. *R.H. Cochran & Assocs., Inc. v. Sheet Metal Workers Int'l Ass'n Local Union No. 33*, 335 F. App'x 516, 519 (6th

Cir. 2009). Here, the Claggetts fully addressed the question of qualified immunity in their memorandum in opposition to the motion for summary judgment; accordingly, there is no waiver.

The doctrine of qualified immunity shields government officials from liability for civil damages for actions taken in the scope of their duties, unless their conduct violates "clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). "Qualified immunity gives government officials breathing room to make reasonable but mistaken judgments about open legal questions" and, "[w]hen properly applied, protects 'all but the plainly incompetent or those who knowingly violate the law.'" *Ashcroft v. al-Kidd*, 563 U.S. 731, 743 (2011) (quoting *Malley v. Briggs*, 475 U.S. 335, 341 (1986)). After a defendant raises a claim of qualified immunity, the plaintiff bears the burden of rebutting it. *Ciminillo v. Streicher*, 434 F.3d 461, 466 (6th Cir. 2006).

To determine whether Wenzler is entitled to qualified immunity, the Court must consider: "(1) whether, considering the allegations in a light most favorable to the party injured, a constitutional right has been violated, and if so, (2) whether that right was clearly established." *Id.* (citing *Saucier v. Katz*, 533 U.S. 194, 201 (2001)). These questions need not be considered in order. *Pearson v. Callahan*, 555 U.S. 223, 236 (2009). If the answer to either inquiry is "no," the government official is entitled to qualified immunity.

Here, the Court need address only the first prong of this test because, even considering the allegations in the light most favorable to the Claggetts, Wenzler's conduct did not rise to the level of a constitutional violation. The Claggetts allege that Wenzler violated their constitutional rights by placing the yellow caution tape along the border between their property and the Adjacent Strip and refusing to remove it.[3] They complain that the caution tape is ugly and offensive. Again, the Complaint does not clearly specify which constitutional rights are implicated by Wenzler's conduct.

Wenzler's conduct does not give rise to a Takings Clause claim because demarcating the property boundary line does not intrude on the Claggetts' property rights. There is no "direct government appropriation or physical invasion of private property," and no "regulatory taking" that denied them all economically viable use of their land. *Lingle v. Chevron USA, Inc.*, 544 U.S. 528, 537 (2005). Under certain circumstances, a regulatory taking may be found if a regulation "impedes the use of property" even if the owner is not deprived of "all economically beneficial use." Factors to be considered include: "(1) the economic impact of the regulation on the claimant; (2) the extent to which the regulation has interfered with distinct investment-backed expectations; and (3) the character of the governmental action." *Murr v. Wisconsin*, 137 S. Ct. 1933, 1943 (2017) (citing

---

[3]  As previously noted, Wenzler testified that he did not participate in the decision to lease the Adjacent Strip to Hatfield. The Claggetts have presented no evidence to the contrary. Accordingly, the Court limits its discussion to claims based on Wenzler's interactions with the Claggetts.

*Penn Central Transp. Co. v. New York City*, 438 U.S. 104, 124 (1978)). Here, however, there is no evidence that installation of the caution tape along the property boundary had any economic impact on the Claggetts at all. Even though it made it more difficult for the Claggetts to mow the narrow strip of grass outside the fence and more difficult to maintain the fence, this does not rise to the level of a regulatory taking.

Wenzler's conduct does not implicate the Equal Protection clause because the Claggetts have pointed to no similarly-situated citizens who were treated more favorably without a rational basis.

Under the circumstances presented here, no reasonable jury could find that Wenzler's conduct in putting up the caution tape to demarcate the boundary violated the Claggetts' substantive due process rights. It was not an abuse of governmental power, but rather a practical solution to an ongoing problem. As previously noted, even after the lease was in place, the Claggetts and Ms. Hatfield repeatedly called the police because they could not agree on the proper boundary line. The police insisted that it was a zoning issue and there was nothing they could do. Wenzler testified that he put up the caution tape so that the property boundaries were clear, not only to the Claggetts and Hatfield, but also to the police. Doc. #48, PageID#417. Notably, Wenzler agreed that, if Claggett put pavers along the boundary line, the caution tape could be taken down. *Id.* at PageID#413.

Likewise, even viewing the allegations in the light most favorable to the Claggetts, Wenzler's conduct does not give rise to a First Amendment retaliation claim. It is undisputed that Anthony Wenzler was very frustrated by Donald Claggett's repeated complaints about Tomi Hatfield and the ongoing property disputes. He admitted this to City Manager David Hicks. Doc. #49, PageID#435. He also admitted that, on the day he put up the caution tape, he was frustrated with Mr. Claggett who was yelling at Hatfield and threatening her. Doc. #48, PageID##416, 418.

When Wenzler came back to adjust the caution tape so that the property boundaries were consistent with the latest survey, he told Mr. Claggett that he was "tired" of him and of "all this." Doc. #1, PageID#6. Referring to the "no trespassing signs that Claggett put on the back of his fence, warning Hatfield to stay two feet off the fence, Wenzler admittedly told Mr. Claggett, "[i]f you're going to be that damn petty, I am being that damn petty." *Id.*; Doc. #48, PageID#418. Wenzler regrets that he "maybe didn't pick [his] words correctly." *Id.* at PageID#421. He denies having "any hard feelings against the Claggetts." He was "just trying to do [his] job." *Id.* at PageID##421-22.

It is undisputed that the Claggetts were engaged in constitutionally-protected activity and Wenzler's comments to Donald Claggett could support a finding that his installation of the caution tape was motivated, at least in part, by the Claggetts' exercise of their First Amendment rights. Nevertheless, no reasonable jury could find that Wenzler's conduct in putting up the caution tape to

delineate the property boundaries caused them to "suffer an injury that would likely chill a person of ordinary firmness from continuing to engage in that activity." *Bloch*, 156 F.3d at 678. Again, the Court finds that the alleged "injury" caused by the presence of the caution tape along the property boundary is so *de minimis* in nature that it does not rise to the level of a constitutionally cognizable injury. *See Maben*, 887 F.3d at 266. Moreover, to the extent that the Claggetts find the caution tape to be ugly and offensive, Wenzler has offered them the option of installing brick pavers to delineate the boundary. Doc. #48, PageID#413.

The Court further finds that Wenzler's comments to Donald Claggett, made in the heat of the moment, may have been inappropriate, but they do not rise to the level of a constitutional violation and do not constitute an "adverse action" that would chill a person of ordinary firmness from continuing to engage in protected First Amendment conduct.

Based on the foregoing, the Court finds that, even viewing the allegations in the light most favorable to the Claggetts, Wenzler's conduct did not violate the Claggetts' constitutional rights. Accordingly, he is entitled to qualified immunity on the § 1983 claims. The Court need not consider whether the constitutional rights in question were clearly established.

For the reasons set forth above, the Court SUSTAINS Defendants' Motion for Summary Judgment, Doc. #43, on all of the § 1983 claims.

## B. State Law Claims

Plaintiffs also assert state law claims of invasion of privacy, nuisance and civil conspiracy against the City and Wenzler. Having granted summary judgment in favor of Defendants on all of the federal claims, the Court declines to exercise supplemental jurisdiction over the state law claims and DISMISSES them WITHOUT PREJUDICE. *See United Mine Workers of Am. v. Gibbs*, 383 U.S. 715, 726 (1966) (holding that if federal claims are dismissed before trial, the state claims should be dismissed as well); 28 U.S.C. §1367(c)(3) (providing that district court may decline to exercise supplemental jurisdiction if it has dismissed all claims over which it has original jurisdiction).

## IV. Plaintiffs' Motion for Partial Summary Judgment on Defendant Tomi Hatfield's Counterclaims (Doc. #30) and Defendant Tomi Hatfield's Cross Motion for Summary Judgment (Doc. #33)

As previously noted, Tomi Hatfield has filed four state law Counterclaims against the Claggetts: (1) intentional infliction of emotional distress; (2) declaratory judgment concerning the validity of the lease of the Adjacent Strip; (3) invasion of privacy; and (4) trespass. Doc. #15.

The Claggetts seek summary judgment on all but the Counterclaim for declaratory judgment, arguing that the court lacks supplemental jurisdiction over the claims, and that they are barred by *res judicata*. Doc. #30. Tomi Hatfield seeks summary judgment on the Counterclaim for declaratory judgment arguing, as

did Plaintiffs, that the court lacks supplemental jurisdiction and that the claim is barred by *res judicata*. Doc. #33.

Having dismissed all federal claims in this lawsuit, the Court also declines to exercise supplemental jurisdiction over these state law Counterclaims and DISMISSES them WITHOUT PREJUDICE. Accordingly, the Court OVERRULES AS MOOT Plaintiffs' Motion for Partial Summary Judgment on Defendant Tomi Hatfield's Counterclaims, Doc. #30, and Defendant Tomi Hatfield's Cross Motion for Summary Judgment on the Counterclaim for declaratory judgment, Doc. #33.

## V.    Conclusion

The Court SUSTAINS the Motion for Summary Judgment of Defendants Anthony Wenzler and the City of Moraine, Doc. #43, with respect to the federal claims brought under 42 U.S.C. § 1983, and declines to exercise supplemental jurisdiction over Plaintiffs' state law claims and Defendant Tomi Hatfield's state law Counterclaims. Accordingly, Plaintiffs' state law claims and Defendant Hatfield's state law Counterclaims are DISMISSED WITHOUT PREJUDICE to re-filing in a state court of competent jurisdiction. The Court OVERRULES AS MOOT Plaintiffs' Motion for Partial Summary Judgment on Defendant Tomi Hatfield's Counterclaims, Doc. #30, Defendant Hatfield's Cross Motion for Summary Judgment, Doc. #33, and Hatfield's Motion for Declaratory Judgment, Doc. #60, in which she seeks a bench trial on the declaratory judgment claims.

Judgment shall be entered in favor of Defendants and against Plaintiffs.

35

The captioned case is hereby ordered terminated upon the docket records of the United States District Court for the Southern District of Ohio, Western Division, at Dayton.

Date: July 12, 2019

WALTER H. RICE
UNITED STATES DISTRICT JUDGE

Exhibit A

